# EXHIBIT A

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
DOMESTIC VIOLENCE UNIT

```
- - - - - - - - - - - - - - - x
                              :
MADISON MINELLI,              : Docket Number: 2019 CPO 0003698
     Petitioner,             :
                              :
     vs.                      :
                              :
JARON PENSIGER,               :
     Respondent.             :
- - - - - - - - - - - - - - - x
JARON PENSIGER,               : Docket Number: 2019 CPO 0001676
     Petitioner,             :
                              :
     vs.                      :
                              :
MADISON MINELLI,              : Friday, September 13, 2019
     Respondent.             : Washington, D.C.
- - - - - - - - -.- - - - - - x
```

The above-entitled action came on for a hearing

before the Honorable JOHN MCCABE, Associate Judge, in

Courtroom Number 114.


APPEARANCES:

On Behalf of the Petitioner:

STEVEN V. VINICK, Esquire
MARITZA M. CARBONA, Esquire
Washington, D.C.

On Behalf of the Respondent:

Pro se

19-04662

**Deposition Services, Inc.**
12321 Middlebrook Road, Suite 210
Germantown, MD 20874
Tel: (301) 881-3344  Fax: (301) 881-3338
info@DepositionServices.com  www.DepositionServices.com

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Mr. Pensiger can come on up.

 3            DEPUTY CLERK:  Calling the matter of Madison

 4    Minelli v. Jaron Pensiger, Case 2019 CPO 1676 and also

 5    2019 CPO 3698.

 6            MR. VINICK:  Good morning, Your Honor.  Steven

 7    Vinick of Stein Sperling and Maritza Carmona of Joseph

 8    Greenwald and Laake on behalf of the petitioner, Madison

 9    Minelli, who is present.

10            MS. CARMONA:  Good morning, Your Honor.

11            THE COURT:  All right.

12            MR. PENSIGER:  Good morning, Your Honor.

13            THE COURT:  Sorry.  Ms. Minelli and Mr. Pensiger

14    are here, and Ms. Carmona and Mr. Vinick, Ms. Minelli's

15    attorneys, are here.  Give me just a moment to grab my

16    file.

17            (pause)
```

**FINDINGS OF THE COURT**

```
19            I can announce my move now.  It may take me a

20    little while in case I'm told that there's -- the only

21    interruption I would anticipate is if another judge tells

22    me they're available to take a case, and then I'll just

23    let those attorneys and parties know that they can go to

24    see another judge, but, otherwise, I'll try to get

25    finished with your case.
```

1          All right, so, as you all know, the Court heard

2    the evidence on Wednesday and yesterday in this case, and

3    the Court heard testimony obviously from both Ms. Minelli

4    and Mr. Pensiger and then other witnesses that testified.

5     Both Mr. Pensiger and Ms. Minelli have filed petitions

6    for civil protection order, and so, as the judge in this

7    case, and, really, in almost all cases, what a judge tries

8    to do first is to determine what the judge thinks the

9    facts are that have been proven.  In other words, what

10   actually happened, and then, the judge, in this type of

11   case where a request is made for a civil protection order,

12   the judge then has to decide whether the facts that have

13   been proven by one side or another demonstrate that the

14   respondent in the case has committed what's called an

15   intrafamily offense.  Now, obviously both Ms. Minelli and

16   Mr. Pensiger are both petitioners and respondents.  Each

17   of them has filed against the other, and so the party

18   that's the petitioner has to prove by what's called a

19   preponderance of the evidence, which the law mainly

20   interprets as more likely than not that the other person,

21   the respondent, has done things that constitute a criminal

22   offense.

23          Part of, some of the facts in the case are not

24   really in much dispute, and I'll talk about that in a

25   moment.  And another thing that's not in dispute is that

1  Ms. Minelli and Mr. Pensiger have had the type of
2  relationship with one another that says that this is the
3  type of courtroom where we can handle that case.  In other
4  words, people who don't know each other and not related by
5  blood, they're not boyfriend-girlfriend, they might have
6  to go to a different courtroom, so that part of the case
7  isn't in controversy.

8          Both parties acknowledge that they've been in a
9  dating relationship -- I was just making sure that the
10 other fellow looks like he knows which courtroom he needs
11 to go to -- but, obviously, what I need to determine is
12 whether either Ms. Minelli or Mr. Pensiger has provided
13 enough evidence for me to conclude that the other has
14 committed some sort of a criminal offense.  -- Give me one
15 moment; I apologize.  I'm a little bit distracted.  It's
16 just because I'm checking my emails --

17         MR. VINICK:  No, worries --
18         THE COURT:  -- to see if --
19         MR. VINICK:  -- Your Honor.
20         THE COURT:  -- a judge is able to take another
21 case.
22         (pause)
23         THE COURT:  All right.  So, I'll just go over
24 what some of the facts are that I don't think are in
25 dispute.  Ms. Minelli is a sophomore at Georgetown

1    University, I believe, 19 years old, and Mr. Pensiger is

2    20 years old and was a student at Georgetown starting in

3    the fall of 2017 and completed two years at Georgetown, is

4    currently not a student there this semester.  It's also

5    not -- both parties agree that they met in the fall of

6    2018, and that was obviously Ms. Minelli's first year as a

7    student at Georgetown, and that they began dating

8    sometime.  The exact date wasn't that important, but it

9    sounds like it was sometime about November or December of

10   2018.

11        It also does not appear to be contested that

12   they continued to date for a few months, that they spent a

13   lot of time together during the months from January to

14   April of 2019, just spent a lot of time together on campus

15   where Mr. Pensiger was living, and then also spent some

16   time at a home where Ms. Minelli was living that happened

17   to be fairly close by the campus.

18        All right.  The next thing that I had written

19   down in terms of things that I thought were not

20   particularly contested were that on April 13th of 2019,

21   both Ms. Minelli and Mr. Pensiger were in a dormitory room

22   on the Georgetown campus, and, at some point, Ms. Minelli

23   contacted Georgetown police officers, and, at some time,

24   the Georgetown police issued what they call a no-contact

25   order to both Ms. Minelli and Mr. Pensiger.

1        In other words, the order, and I think Mr. Vinick

2   had that introduced into evidence in the case.  It

3   essentially said they're both supposed to stay away from

4   one another.  Must not approach telephone, email, text

5   message, engage through social media, etc., so fairly

6   similar to the type of things that perhaps a judge can

7   order in a civil protection order case.  Obviously,

8   there's different possible consequences, such a thing as

9   violated a court order from this Court.  If either

10  violates it, they could be charged with a criminal offense

11  called violation of protection order, so it's obviously up

12  to Georgetown, what they want to do if they conclude

13  someone violated a no-contact order.  But, in any event,

14  it didn't seem like that was contested, that both parties

15  were aware by, at the latest, I guess, April 14th, the

16  very next day, that there was such an order to each of

17  them that they were to stay away from one another.

18        It also does not appear to be contested that on

19  April 29th of 2019, that's about two weeks later, that Mr.

20  Pensiger approached Ms. Minelli on the Georgetown campus

21  with flowers in his hand.  He walked up to her.  She

22  indicated either through words or actions that she did not

23  wish to accept flowers from him.  He put the flowers down

24  and left the area.

25        And then it's also not contested that on April

1  30th, the next day, Ms. Minelli filed a petition for a

2  civil protection order and was given a temporary

3  protection order, which is often what happens in these

4  cases, that a judge issues a temporary order that is good

5  until the hearing where both parties can be present, and

6  that temporary order was extended a few times, remained in

7  effect till August 8th of this year.

8        It is also not contested that, and there it

9  wasn't necessary testimony about this, but this I know,

10  just from my court records, is that on May 6th that, so

11  six days later, Mr. Pensiger filed a petition for a civil

12  protection order against Ms. Minelli, and he also was

13  given a temporary protection order that day, which

14  remained in effect also till August 8th.

15        And then on August 8th, both parties were in

16  court, and I was the judge that day, and both parties

17  agreed to dismiss their civil protection order petitions.

18   Both of them at that time had counsel with them, and they

19  each indicated that they were working on a separate

20  agreement outside of court and were willing to dismiss

21  their civil protection orders, obviously, so it doesn't

22  matter to the judge whether people are working on a

23  separate agreement if they both tell a judge they want to

24  dismiss their case.  The judges will generally do that,

25  and that's what happened on August 8th.

```
1               At some time, within a few days after that, the
2    exact date, you know, I think, there was a, what's called
3    a voluntary settlement agreement that was worked out, it
4    appears, by both Ms. Minelli and Mr. Pensiger and
5    attorneys that were representing them, and I'm not sure
6    that they both signed it on the same date.  But,
7    certainly, within a week or so after August 8th, it
8    appears that both parties had signed this voluntary
9    settlement agreement, which, obviously, I assume is what
10   they were talking about when they told me in court they
11   were working on an agreement.  That agreement also was
12   part of the evidence and was accepted in evidence as an
13   exhibit that was introduced by counsel for Ms. Minelli.
14               All right, and obviously the agreement will
15   speak for itself.  It's got several pages to it, but some
16   of the important things in the agreement were that they
17   both were agreeing to dismiss their cases, which had
18   actually already had been done.  Their civil protection
19   order cases, they each agreed to dismiss any Title IX
20   claims they might have filed with Georgetown University.
21   Also Mr. Pensiger was agreeing to not have any contact
22   with Ms. Minelli, excuse me, and that he has also listed
23   two of her family members, any residents that he was to
24   stay away from, and it also said that, however, he was
25   permitted to send a letter to, one letter, to Ms. Minelli
```

1    through counsel, and that if he did choose to write such a

2    letter and send it through counsel, that would not be

3    considered a violation of the agreement that the parties

4    had worked out.  Exhibit 7 was also introduced by counsel

5    for Ms. Minelli, which was a typed letter that everyone

6    agreed had been sent through counsel from Mr. Pensiger to

7    Ms. Minelli.

8            It's also not contested that sometime in

9    August, the exact date is not clear, but it was certainly

10   after this voluntary settlement agreement was entered into

11   and after the civil protection order cases had been

12   dismissed.  Mr. Pensiger mailed the letter to Ms. Minelli

13   at an address on O Street and also fairly near the

14   Georgetown campus, and that letter was handwritten, and it

15   was in an envelope, and it was nearly identical to the one

16   that had been typed and sent through counsel.  And

17   Exhibits 5 and 6 were the envelope that it was sent in and

18   the letter itself.

19           It's also not contested that on August 28th,

20   Mr. Pensiger filed a new petition for a civil protection

21   order, and a temporary order was granted that day and

22   extended until today.  Then, on September 3rd, Ms. Minelli

23   filed to reinstate her petition, either way was really

24   fine, to either reinstate the prior petition or file a new

25   petition.  Mr. Pensiger filed a new petition, and Ms.

1   Minelli filed to reinstate her former petition.  I think

2   both had additional things in their petitions that were

3   not in the prior petitions, because these were things that

4   happened after the date of the other case.

5            So, DC code Title XVI section 1005 requires that

6   a judge determine whether the other side has committed, as

7   I said, what's called an intrafamily offense, and what

8   that means is a criminal offense committed by someone

9   against someone with whom they have an intrafamily

10  relationship.  As I said earlier, it's not contested that,

11  it's obviously clear that these folks had what's called an

12  intrafamily relationship.  It doesn't mean they're family

13  members; it means it can be people that are brother and

14  sister, it can be people that are husband and wife, or

15  people who are just engaged in a boyfriend-girlfriend-type

16  relationship for some period of time, and so the judge

17  then determines whether whatever facts the judge concludes

18  were proven constitute a criminal offense.

19           The criminal offense that Ms. Minelli alleges

20  is stalking, based upon three specific things that were

21  listed:  The April 29th incident where Mr. Pensiger

22  brought flowers, approached Ms. Minelli with flowers.  The

23  second of the three things was mailing a letter, the

24  letter to her, after the voluntary settlement agreement

25  had been entered into, and then the third specific

1   incident that was being alleged as part of the evidence of

2   stalking was the allegation that Mr. Pensiger had sent Ms.

3   Minelli some text messages in late April in that he was

4   pretending to be Ms. Minelli's boyfriend.  So, now, we're

5   going to get into the things that obviously were not

6   agreed upon.

7          Mr. Pensiger alleges, the crime that he alleges,

8   he is not alleging stalking.  He alleges simple assault

9   and lists four dates where he claims Ms. Minelli assaulted

10  him.  There are other allegations in the petitions, but

11  the court is just addressing the ones that it believes

12  were essential to other allegations by Mr. Pensiger, but

13  the Court is just addressing these four specific

14  allegations about which the evidence was presented by Mr.

15  Pensiger and Ms. Minelli.

16         So, in Mr. Pensiger's petition, he alleges that

17  on February 5th that Ms. Minelli, that they were both

18  together -- I'll take a look at the petition again to make

19  sure I don't confuse the incidents --  all right, that

20  they were at a home on Prospect Street, which they both

21  agreed is a place where family members of Ms. Minelli, it

22  may have been a grandmother, but near the Georgetown

23  campus that where Ms. Minelli was staying, hints that Mr.

24  Pensiger sometimes would visit there and even spend the

25  night.  So, the allegation he made was on February 5th, at

1   about 10 in the evening, that he and Ms. Minelli were at

2   that home and laying in bed and that he, she struck him in

3   the back one time.  He also alleged that on March 17th,

4   they were also at this home on Prospect Street, and that

5   she threw a canteen at him, which caused a cut to his

6   chin.  And he alleges that on March 20th, at a dorm room

7   called McCarthy Hall at Georgetown, that Ms. Minelli

8   slapped him on the cheek, and he also alleges that, on

9   April 2nd, also at McCarthy Hall, Ms. Minelli slapped him

10  with an open hand and shoved his body.

11         Mr. Pensiger didn't claim that he received

12  serious injuries from any of these incidents, but his

13  testimony clearly makes out the elements of a simple

14  assault, for someone to slap someone on the cheek or slap

15  them in the face, or throw a canteen at them and it hits

16  them, and he claimed it caused a cut to his chin, and to

17  strike them in the back, makes out the elements of a

18  simple assault.

19         As Ms. Minelli's attorney pointed out in

20  closing argument, there were not any other witnesses to

21  any of these incidents, and that's certainly not an

22  uncommon thing obviously in cases involving altercations

23  between boyfriends and girlfriends.  It's often that the

24  two of them are the only people who are present, and that

25  obviously sometimes means that there isn't another witness

1   who can say for sure that someone did, in fact, assault

2   someone else.  But, obviously it's correct to point out

3   that there's not corroboration from another witness.

4          But, in the Court's view, for two reasons that

5   I do credit Mr. Pensiger's testimony and do find that Ms.

6   Minelli assaulted him on each of these four occasions, is

7   that part of the corroboration is he showed a photograph,

8   obviously.  There was differing views as to what, that

9   shows a small cut on his chin.  Mr. Pensiger claimed that

10  that was from the canteen striking him.  Ms. Minelli said

11  that she never threw a canteen at him, so, obviously, she

12  didn't cause any bruise and that he had told her some

13  other reason why he had that mark.

14         Other corroboration, at least for one of the

15  Incidents, was provided through text messages that were

16  introduced into evidence by respondent.  Both parties

17  agreed that these are text messages they exchanged on the

18  evening of April 2nd.  Obviously, for like a lot of these

19  things, you don't know for sure all the things that were

20  talked about prior, but there's a text message where Mr.

21  Pensiger says:

22                        "I appreciate you making my

23                        concussion and head worse by

24                        hitting me."

25         And Ms. Minelli responds:

1                            "I thought we were over this

2                            whole thing.  I kissed you and

3                            said, sorry, that I love you.  I

4                            shoved your body, not your head."

5            Let me just see if there's anything else on

6  this.  All right, that obviously appears to be some

7  acknowledgement by Ms. Minelli that she at least pushed

8  his body.  She seems to be denying that she struck him in

9  the head.  Obviously, this isn't iron-clad proof that she

10 hit him in the head or slapped him in the face as Mr.

11 Pensiger claimed.

12           Certainly, some of the backdrop to this is that

13 Mr. Pensiger stated he had previously had a head injury

14 from about a year later that was obviously in no way

15 caused by Ms. Minelli.  It happened before he met her, but

16 that things like strikings to his body might exacerbate

17 that injury.

18           Perhaps the evidence that made it fairly not

19 particularly difficult for the Court to find that Ms.

20 Minelli assaulted Mr. Pensiger was that she acknowledged

21 it during her testimony.  I mean, she certainly didn't

22 agree to necessarily to all the details of each incident,

23 but she acknowledged striking him.  The explanation was

24 essentially that he had said things that were hurtful to

25 her.  Obviously, that does not make out self-defense.

1            The Court also notes that it really doesn't

2    think there was a whole lot of evidence of what it is that

3    was said that was nasty.  I mean, it wasn't, but even if

4    there was, if there was testimony that Mr. Pensiger had

5    said, you're not intelligent, or you're unattractive, or

6    you're not a nice person, I don't like you, there's any

7    manner of things that people can say to one another that

8    are hurtful, and I'm not in any way undermining that

9    people in relationships can be very hurt by others if the

10   other person says something that's unkind or nasty.

11   Racist things can be said.  There's all kinds of things

12   that people say to one another that are very unpleasant

13   and very upsetting, but there's not too many circumstances

14   in which someone saying something to you means that if you

15   hit them, you can say that you were hitting them in self-

16   defense.

17            I think it was revealing and somewhat

18   concerning to the Court that Ms. Minelli seems to think,

19   and I'm not sure why, that she did have the right to hit

20   someone because they said something that she didn't like.

21    Obviously, a person can hit someone, but you're not

22   acting in self-defense if you strike someone because your

23   feelings have been hurt.  Again, I'm not saying that to

24   say that it's not a serious thing that people get their

25   feelings hurt.

1          Ms. Minelli and Mr. Pensiger are in a stage in

2   their lives where they're probably under a lot of stress.

3    I mean, I still get upset even thinking about what it was

4   like to be at college.  It's very stressful.  There's a

5   lot of studying, you're very busy, and there's a lot of

6   things, there's a lot of reasons why people are stressed,

7   but you can't hit each other unless they're doing so in

8   self-defense.

9          So, I may talk about this a little bit more,

10  but clearly the Court found Mr. Pensiger to be a credible

11  witness and a more credible witness than Ms. Minelli for

12  reasons that I'll talk about.  But, actually, in this

13  case, there actually wasn't that much dispute about the

14  salient facts.  So, even on Ms. Minelli's testimony, the

15  Court likely would have found by preponderance of the

16  evidence that she assaulted Mr. Pensiger, so I will grant

17  his request for a civil protection order, and I'll get to

18  the terms of it, but it'll be the standard terms that she

19  is to stay at least 100 yards away from him and not

20  contact him in any manner.  I'll probably put exception,

21  with the exception of through attorneys.

22          I'm also going to talk to the parties again

23  when I finish giving my ruling about other things they

24  might wish to consider.  It's obviously up to them.  My

25  work on this case will be finished after today, but I'm

1    going to take time to encourage you to consider other

2    things that the parties might do after I finish with my

3    ruling.

4            So, now turning to Ms. Minelli's petition and

5    her allegation and her request for a civil protection

6    order against Mr. Pensiger, it bears saying -- give me

7    just a moment --

8            THE COURT:  I'm not going to, are you trying to

9    tell me something?  Oh, okay, because I'm, even if there's

10   another judge ready, I'm just going to finish this before

11   I move to another one.

12           MR. VINICK:  Yeah, that's okay.

13           THE COURT:  It bears stating up front that

14   there's not an allegation by Ms. Minelli, and obviously

15   she shouldn't allege it unless she believes it happened.

16   There's no allegation of assault, threats, or destruction

17   of property, which are probably the three most common.

18   Assault and threats are really by far the two most common

19   things that bring people into this courtroom.

20           If you visited this courtroom for a

21   day or two, you would see what that often means if people

22   with assaults far worse than what Ms. Minelli did just by

23   slapping or shoving Mr. Pensiger.  Folks who get choked,

24   folks who get black eyes, folks who get really serious

25   cuts or choked to the point where they're barely able to

1   breathe, that doesn't mean that less serious assaults like

2   the ones that Mr. Pensiger was the victim of aren't also a

3   basis for a civil protection order.

4           But there was no such allegation, well, there

5   was originally an allegation made of a sexual assault,

6   which is obviously a very serious offense, and obviously

7   if this Court concluded someone had sexually assaulted

8   someone else, I would almost certainly issue a restraining

9   order against the person who had committed the assault.

10  All that was talked about in this case was sending the,

11  trying to bring the flowers on April 29th, sending the

12  letter in late August, and also possibly sending text

13  messages impersonating a former boyfriend of Ms. Minelli.

14          So, as counsel correctly stated, the only crime

15  that could be alleged under those circumstances is

16  stalking, because obviously walking up to someone with

17  flowers or mailing them a letter in and of themselves are

18  not crimes, but under certain circumstances, perhaps they

19  could constitute a crime of stalking.

20          So, I look to DC code 22-31-33 for the

21  definition of stalking, and let me just make sure to just

22  read from the statute.  I won't, obviously, read the

23  entire thing, but 22-31-33:

24                          "It is unlawful for a person to

25                          engage in a course of conduct

```
1                          directed at a specific individual
2                          -- and then there's three options
3                          -- with the intent to cause that
4                          individual fear for his or her
5                          safety or the safety of another
6                          person; to feel seriously
7                          alarmed, disturbed or frightened;
8                          or, three, to suffer emotional
9                          distress."
```

10          So, one way a person can stalk is a person acts

11   with the intent to cause the other person to fear for

12   their safety or the safety of another person, feel

13   seriously alarmed, disturbed, or frightened, or suffer

14   emotional distress.  So that's one way that stalking can

15   be proved, is to show that the person, in other words in

16   Mr. Pensiger's position intended to cause that to Ms.

17   Minelli.

18          Second option is that the person in Mr.

19   Pensiger's situation knows that that person, even if they

20   didn't intend to do it, to cause it, that they knew that

21   it would cause the person, Ms. Minelli's situation, to

22   fear for her safety or the safety of another person, feel

23   seriously alarmed, disturbed or frightened, or C, suffer

24   emotional stress.

25          And then the third option -- these were sort of

1    in declining order of how much proof or what exactly has
2    to be proved in terms of the state of mind of the person
3    in Mr. Pensiger's position -- so the third option is, even
4    if he didn't intend to cause those effects, or didn't know
5    that they would be caused, that he should have known that
6    the actions he took would cause a reasonable person in Ms.
7    Minelli's circumstances to again fear for her safety or
8    the safety of another person; feel seriously alarmed,
9    disturbed, or frightened; or C, suffer emotional distress.
10
11           In another part of the statute, it gives you
12   examples of what a course of conduct would mean, and
13   that's in 22-31-32.  There're three options:  One of them
14   is the one, really, that would be most applicable to what
15   is being alleged in this case.  The other two don't appear
16   to imply.  One of them is interfere with damage or take or
17   unlawfully enter an individual's real or personal
18   property.  There wasn't discussion of that in the case or
19   use of another individual's personal identifying
20   information.  There really wasn't, in the Court's view any
21   -- that wasn't really what was alleged, in this case.
22   What was alleged as the first option, which is probably
23   the most common option in terms of people alleging a
24   course of conduct, and that's to follow, monitor, place
25   under surveillance, threaten, or communicate to or about

1   another individual.  And so that's what the law states

2   about stalking.

3          So, again, the incidents that are alleged to

4   have made up a course of conduct by Mr. Pensiger are

5   three:  The approaching with flowers, the mailing the

6   letter, and sending emails to Ms. Minelli sort of under

7   false pretenses, pretending to be someone else, a former

8   boyfriend of hers who was referenced by the initials AJ.

9          So, let me just start with that particular

10  incident, because the other two are not in dispute, that

11  they actually happened.  Mr. Pensiger denies that he sent

12  emails to Ms. Minelli, and that she was asking the Court

13  to infer that Mr. Pensiger actually sent some emails to

14  Ms. Minelli, and those emails were introduced into

15  evidence.  Even if the Court -- and so there's some emails

16  back and forth on April 26th and April 27th --

17          MR. VINICK:  Excuse me, Your Honor.  I'm sorry.

18   I apologize for interrupting, but the fourth one,

19  allegation, I hadn't heard you mention was our allegation

20  that he also impersonated her texts and then went to the

21  office of student conduct immediately after the flower

22  incident.

23          THE COURT:  All right.  I don't think that was

24  actually listed in your petition as an incident of

25  stalking, but certainly I can consider --

1          MR. VINICK:  You can consider it as evidence.

2          THE COURT:  -- that as well --

3          MR. VINICK:  Yes.

4          THE COURT:  -- and I'll be getting to that

5    allegation in a moment.

6          Mr. Pensiger denies that he sent these letters,

7    and obviously the Court is aware there's certainly folks

8    who have a lot more facility with social media and so

9    forth in this Court, are able to figure out a way.  Almost

10   anyone could do that, could use someone else's phone and

11   send a text message to a person and pretend they are

12   someone else.  But I just don't find by preponderance of

13   the evidence that that happened in this case.

14         I believe Mr. Pensiger when he says that, I

15   didn't do that, in part, because I found him to be a more

16   credible witness than Ms. Minelli, in general.  That's

17   really the main reason, and also the fact that it's, while

18   it's doable, it seems rather far-fetched that Mr. Pensiger

19   has a way of getting at Ms. Minelli, would start sending

20   her emails pretending to be her former boyfriend, or she

21   claims that she believed it was Mr. Pensiger.

22         So, what remains in the Court's view, since I

23   don't believe that he sent those false emails, are the

24   incident of the April 29th delivering flowers, and the

25   August 2019 mailing the letter.  I'll say up front, I also

1   don't conclude, and I'll get to that, but since you asked

2   about it, I don't conclude that he manufactured a text

3   message on April 28th, in which Ms. Minelli purports to be

4   inviting to meet him on April 29th.  I find that she did

5   actually send those messages to him and did invite him to

6   come and meet her on Aril 29th, which is obviously one of

7   the reasons why I'm not concluding that these other two

8   incidents constituted stalking by him.

9           So, what we need to be alleged is that Mr.

10  Pensiger either intended to cause her that kind of

11  emotional distress or knew it would cause her that kind of

12  distress, or should have known that a reasonable person

13  would suffer than kind of emotional distress.  Specific

14  things are set forth here for her safety and the safety of

15  another person, and let me be precise:

16                          "Feel seriously alarmed,

17                          disturbed, or frightened, or

18                          suffer emotional distress."

19          Let me just be clear that the Court is not

20  suggesting that Ms. Minelli hasn't suffered a lot of

21  emotional distress over the past several months,

22  presumably in part, perhaps in large part, because of the

23  way her relationship with Mr. Pensiger has gone, but it's

24  not enough that a person suffered distress.  I mean,

25  obviously, lots of people suffer severe emotional distress

1   when relationships end.  But, obviously, under the law, a

2   lot more has to happen before a person is committing a

3   crime of stalking.

4        So, one of the most important things is also

5   obviously to consider the circumstances.  Counsel for Ms.

6   Minelli properly pointed out that at the time Mr. Pensiger

7   approached Ms. Minelli with flowers on April 29th, there

8   was an order in place that Georgetown had issued that he

9   stay away from her and also that she stay away from him.

10  Certainly, my job isn't to decide whether he violated the

11  order and should suffer some consequences of Georgetown,

12  but certainly Mr. Vinick is absolutely correct that I

13  should consider that in determining whether his doing so,

14  bringing the flowers when there was a stay-away order,

15  whether that obviously is part of what makes me to try

16  decide whether he was engaging in a course of conduct that

17  meant stalking.

18       And Mr. Vinick is also absolutely correct that

19  the Court should consider the fact that, at the time the

20  letter was mailed, there was a separate civil agreement

21  that says that it's okay for Mr. Pensiger to write one

22  letter and sent it through counsel, and that was done.

23  But that's the only letter he's supposed to write, and

24  it's not contested that he mailed a separate letter in

25  addition to the one that was sent through counsel,

1   although it was almost identical.

2           So, those are some of the circumstances, but

3   here's all the other circumstances the Court takes into

4   account in determining.  So, when someone has flowers

5   brought to them, perhaps that person didn't want the

6   flowers to be brought to them.  Perhaps someone in Ms.

7   Minelli's position didn't want to receive that mailed

8   letter.

9           Again, not every time someone after a breakup

10  reaches out to contact another person, even if the other

11  person has said I prefer you not contact me, it doesn't

12  necessarily make it a crime.  Obviously, I can be, but

13  some of the ways that the Court sees him stalking or

14  barrages of emails, fifty a day, text messages, lingering

15  outside the person's home late at night, sending them

16  messages through a third party saying, I'm never going to

17  let you go, I'm never going to leave you alone.  Again,

18  I'm not suggesting those are the only, but these are the

19  kinds of things that are more clearly stalking.  And also

20  it helps an argument that they're stalking when there's

21  been prior threatening things or violent things that have

22  happened.

23          There was zero evidence in this case that Mr.

24  Pensiger has ever assaulted Ms. Minelli, has ever

25  threatened to harm her, has ever destroyed her property.

1  No evidence he's been following her around, has been seen

2  waiting outside her door, outside her family's home, no

3  barrage of emails, no text messages, no evidence even to

4  suggest that he's at this time trying to renew the

5  relationship.  Actually, quite the opposite that's shown

6  in some of the evidence, the emails that were exchanged,

7  as I'll get to in a minute, on April 13th, as well as the

8  letter.

9         The Court doesn't necessarily have to know

10  this, but there really isn't before me any particular

11  evidence to why the relationship did end.  Perhaps it

12  might have provided some context to an allegation that Ms.

13  Minelli was afraid for her safety, her physical safety, as

14  opposed to just being protected from emotional hurt that

15  obviously comes when relationships end.

16         So, other than the suggestion that Mr. Pensiger

17  sent the fake AJ text, which I do not find happened, the

18  only allegations that Mr. Pensiger tried in any way to

19  have any contact with Ms. Minelli over a course of what is

20  now five months, today's September 13th, the late hours of

21  April 13th and April 14th were when apparently the no-

22  contact order was issued, so, in that five-month period,

23  he tried to bring her flowers on April 29th, and he mailed

24  her a letter that was nearly identical to a letter that

25  was authorized by counsel.

1          Method of delivery was obviously not

2  authorized.  Though he had the ability to contact her, he

3  knows where she lives, he knows where she goes to school,

4  I didn't hear anything about him following her around

5  campus.  Again, no contact other than the April 29th

6  flowers and the sending her the letter, and as I'll get

7  to, the responses to what I conclude were her emails to

8  him on April 28th.

9          Again, and obviously another thing, as I look

10  at the incidents themselves, the evidence on April 29th is

11  that Mr. Pensiger approached Ms. Minelli in the daylight

12  in the middle of campus with presumably dozens of

13  witnesses around.  He didn't go up behind her in a dark

14  alley with flowers in the middle of the night.  She

15  indicated that she was not interested in the flowers.  He

16  put them down and walked away.  So, obviously, nothing in

17  that is inherently threatening or frightening unless

18  there's some other circumstances such as prior assaults,

19  prior threats.

20          As to April 29th, I do credit, certainly, I

21  credit Mr. Pensiger's testimony that he received emails on

22  April 28th, just like I credit Ms. Minelli's testimony

23  that she received emails on April 26th and 27th.  I just

24  don't believe Mr. Pensiger sent those, but I do believe he

25  received those emails -- I'm sorry, texts.  I keep saying

1  emails -- and that that's why he thought Ms. Minelli was

2  actually inviting him to meet.  Let me just see what the,

3  read what the emails say from April 28th.

4          (pause)

5          THE COURT:  Certainly, I've considered the fact,

6  and both sides agree, this phone number, the phone that

7  sent the text messages to Mr. Pensiger was not a phone

8  number that Mr. Pensiger had ever communicated with Ms.

9  Minelli through, and obviously she denies she sent these

10  messages, but the content of them leads the Court to

11  believe that she actually sent them.

12          I mean, the allegation is that Mr. Pensiger

13  came up with this master plan that he was going to

14  approach her with flowers and, to cover himself, he would

15  back-date some text messages from the day before of Ms.

16  Minelli purporting to be asking him to visit.  But, in

17  general, because I found him a more credible witness, I

18  don't believe that he's making this up, that he received

19  them, and I don't believe Ms. Minelli when she says she

20  didn't send them.  I believe that she did.

21          I don't want to read too much of it.  It's

22  personal things, but obviously all of this enters into the

23  Court's consideration about whether she was afraid of him.

24                  "I'm so sorry -- "

25  This is the text message that was sent by the person that

```
 1  I conclude is Ms. Minelli:

 2                              "I'm so sorry that everything has

 3                              been going the way it has.  The

 4                              past two weeks has been terrible

 5                              without you.  I love you so much.

 6                               You're my person, Jaron, I'm

 7                              skipping around.  I know we have

 8                              a no-contact order between us,

 9                              but I obviously won't tell my mom

10                              or report you if we meet up to

11                              talk.  Can we meet tomorrow,

12                              maybe around 1, when I'm done

13                              with my psych exam. We could meet

14                              by Red Square.  I love you so

15                              much.  Please know that, and you

16                              mean the world to me."

17          And then Mr. Pensiger, presumably glad that she

18  did reach out because he doesn't even know why there's a

19  no-contact order:

20                              "I'm so happy you reached out.  I

21                              love you so much.  We can use

22                              this time in the summer apart to

23                              reevaluate if we're meant for

24                              each other, and if we think it's

25                              a good idea to get back together.
```

1                          But we need to be able to think
2                          about it, so we make good
3                          judgment.  I'll meet you by Red
4                          Square around one tomorrow, but
5                          let's not talk that much in
6                          between, because I don't want
7                          your mom reporting me again."
8           The person I conclude is Ms. Minelli responds:
9                          "Okay, I'll see you tomorrow
10                         around one.  I love you and I
11                         miss you."
12          And then some further detailed information
13   about Russia.  Again, it's possible that Mr. Pensiger
14   decided that in order to cause her emotional distress or
15   to fear for her physical safety, I'm going to come up with
16   a plan to meet her tomorrow, and so let me set the
17   predicate for that by sending these emails that Ms.
18   Minelli didn't send.  But I don't believe that's what
19   happened, and part of it is, part of the reason, as I
20   said, because I found him to be a more credible witness,
21   in general.
22          I don't think he's as much concerned about
23   getting Ms. Minelli kicked out of Georgetown as she is
24   wanting to get him kicked out of Georgetown.  But, also
25   because Mr. Pensiger, immediately when this happened, he

1   runs to the Georgetown police, because he feels that he's

2   been set up.  He feels like he's been told, like, hey, let

3   the word out that no-contact order, and he brings the

4   flowers to her, and then he realizes her reaction, and by

5   the fact that he sees her mom nearby, that who he knows

6   doesn't want him to be with Ms. Minelli, that, oh, no,

7   they're going to say this is a violation of the no-contact

8   order, so I'm going to go to Georgetown and present the

9   context.

10          To me, the most logical, where I conclude, is he

11  did that, because he realized, oh, no.  She must, I guess

12  she changed her mind since yesterday?  Who knows why, but

13  I want to make sure that I go to them, because, yes, I

14  know I violated their no-contact order, but I want to

15  explain why.

16          Even if I'm wrong and Ms. Minelli didn't send

17  this text message and Mr. -- I just don't find that Mr.

18  Pensiger is just making this up, that he received these

19  text messages on April 28th.  He had reason to think that

20  Ms. Minelli, even it turns out she wasn't the one who sent

21  them and some other person sent them without her

22  knowledge, I believe he received them, and whoever sent

23  them, if it wasn't Ms. Minelli, whom I believe it was,

24  certainly said enough personal things for him to be

25  reasonable in concluding that Ms. Minelli was asking him

1  to meet, so clearly he wasn't, he was under the impression

2  she wanted to meet, and he wasn't trying to cause her fear

3  or thinking it was going to cause her fear.  Why would he

4  think someone who's asking him to get together is going to

5  be afraid of him?

6       The August letter, first of all, as is pointed

7  out, the attorneys all agree that -- a little bit of

8  attorney overkill in my view -- but a bunch of attorneys

9  negotiated some agreement by which Mr. Pensiger would be

10  able to write one letter to Ms. Minelli, sort of the

11  farewell to their relationship, but it had to be gone

12  through attorneys, and it certainly is a sensible

13  procedure to try to ensure that there wouldn't be anything

14  hurtful or threatening sent before it was transmitted.

15       But the Court obviously looks at the content of

16  the letter.  I mean, it would be one thing if the letter

17  is, like, I don't care what these people say, you and I

18  are never going to be done, I'm never going to let you go,

19  I'm going to be seeing you around campus waiting around

20  your home.  I mean, obviously, that would make it more

21  likely, I would find that this was evidence, of a course

22  of conduct, was stalking.

23       The attorneys can only do what they do with the

24  evidence that's before them.  They didn't point out a

25  single line in the letter that was in any way threatening

1  or even unkind.  That's because there isn't anything in
2  the letter that's threatening or unkind.  I'm going to
3  read the entire letter, but essentially the letter
4  involves wishing her the best, saying I'm so sorry we had
5  a difficult relationship.  I'm thankful for having you in
6  my life, even encouraging her that in her future
7  relationships with other people that, make sure that this
8  is a person who has your best interest at heart, you don't
9  deserve any less, make sure this is a person who fights
10  for you when you need it, make sure that they love you
11  endlessly.  On that note, I'll let you go.
12          He doesn't say he's going to reach out to her or
13  contact her.  Again, the Court doesn't mean to imply that
14  even a letter that might not have threats in it couldn't
15  be stalking if part of the other evidence was that there
16  is a long history of abusive behavior by the person who
17  wrote the letter.  Again, there's nothing before me, not a
18  single assault, not a single threat.  And you combine that
19  with a letter that is not remotely threatening or scary.
20          Now, obviously, I should consider whether the
21  fact that the letter was received in the mail separate
22  from the letter that was typed up, of course, I should
23  consider that, and the attorneys for Ms. Minelli are
24  correct, but, again, under all circumstances, the fact the
25  letter was received in the mail, I certainly would not be

1  surprised if that was upsetting to Ms. Minelli, but it's

2  far from stalking for all the reasons thus far that I've

3  listed.

4          Another part of the Court's evidence that I

5  relied on heavily is Exhibit 10, which Mr. Pensiger had,

6  and it's not contested that this was, in fact, an email

7  exchange. The email exchange is on April 28th and is part

8  contested as to whether these are the two parties to those

9  email/text messages.

10         But it was uncontested that on April 13th, the

11 same day that the stay-away order ended up being issued,

12 again, for reasons that are not at all clear to this

13 moment to the judge.  They apparently spent quite a bit of

14 time together, a Potomac River cruise, I think, and a

15 dinner, and ice cream, and then back to the dormitory,

16 took all kinds of pictures, and, again, this Court has

17 been doing this long enough to know that there can be

18 happy times between people and happy pictures, and then

19 people still commit crimes towards one another, but, of

20 course, I have to consider that.

21         But I also considered text messages that were

22 sent apparently after the Georgetown police had told both

23 of them that we're issuing a no-contact order against both

24 of you.  So, this text-message train starts at 11:40, and

25 Mr. Pensiger is the first:

```
1                          "I'm sorry, Maddie.  He told me -
2    I assume he must be referring to some Georgetown police
3    officer --
4                          "that you requested a no-contact
5                           order, but I could still contact
6                           you right now as a one-time deal,
7                           because it hasn't been issued
8                           yet.  Please understand I'm going
9                           through a lot of difficulties,
10                          and that it's best that we have
11                          space.  Please tell me as well if
12                          this is us breaking --"
13   I guess it means breaking up.
14                          "-- so I know if I can pursue
15                           other opportunities."
16        Maybe I'm not consistent with someone who's
17   intending to continue to pursue a relationship with Ms.
18   Minelli but is rather asking, like, if we're broken up,
19   then I assume we'll both move on.
20                          "I won't contact you until you
21                           make contact."
22        Ms. Minelli, again, obviously, knowing that
23   she's been told by Georgetown that neither one of them is
24   supposed to be contacting each other, responds back.  I
25   won't read all of it, but I'll read the part that, again,
```

35

1  the Court considered in determining whether she was

2  actually afraid for her safety, as opposed to just upset

3  about the course of their relationship.

4                          "As I stare out the window on the

5                          car ride home, all I can think

6                          about is the very first date we

7                          had.  You were it for me.  From

8                          that day on, I loved you with

9                          every bit of my heart, and I

10                         always will.  I hope that in time

11                         or someday you'll be able to see

12                         why I did this.  I knew you had a

13                         tender heart when I met you, and

14                         I wanted to be the one to take

15                         all the pain away.  Thank you for

16                         showing me that I was capable of

17                         love and being loved.  This is

18                         the hardest moment of my life,

19                         and I don't know how I'll

20                         overcome this.  I just hope that

21                         you'll see my intentions and

22                         realize they're pure and out of

23                         unconditional love.  Goodbye.  I

24                         will forever love you.  I don't

25                         want anyone in this world.  I

1                               don't care about any other

2                               relationship or any other guy.

3                               You have no idea how hard this is

4                               for me.  Every bit of my heart

5                               hurts, but this is what has to be

6                               right now.  I love you forever."

7          This is not someone who's afraid of Mr.

8    Pensiger.  There is no reference I note, and this is again

9    part of what the Court considered in determining who was

10   more credible, even though, as I indicated, most of the

11   facts are actually not even in dispute.  But those few

12   that are in dispute, like whether Ms. Minelli sent the

13   April 28th emails agreeing to meet with Mr. Pensiger.

14          It's things like this that there's no reference

15   in these emails that would indicate to me that Mr.

16   Pensiger had actually tried to commit suicide on April

17   13th, which is what she claims was the reason the police

18   were called.  If so, I would assume she'd be trying to

19   know, are you sure you're okay.  You just told me you were

20   going to commit suicide a couple of hours ago.  He denies

21   that that happened, and I believe him, in part, because

22   there's nothing in this email train that suggests that

23   that's what had happened.

24          There is no reference or nothing in these

25   emails that's consistent with the allegation which wasn't

1   pursued at trial, but was put in court papers, which was

2   -- Georgetown University and which is resultant in this

3   young man losing a semester of college, and I assume

4   perhaps still worried if he's ever going to be back.  An

5   allegation was made that he had sexually assaulted her

6   eight days earlier.  Again, no evidence of that was

7   presented during trial, and obviously there may be reasons

8   why.

9          But there's nothing in this email train that

10   suggests or the fact that they just spent the whole day

11   together on April 13th, that she had been a victim of a

12   sexual assault by him eight days earlier.  Again, I want

13   to make sure and make clear that it's absolutely possible

14   that people can have fun during the day, and one of them

15   can sexually assault the other that night.  Even spouses

16   can sexually assault one another, so the fact that they

17   had had consensual relations previously doesn't mean that

18   it's not possible that Mr. Pensiger could have sexually

19   assaulted her at some point.  I'm just saying that

20   extraordinarily serious allegations were made with

21   extraordinary serious consequences for this young man, and

22   that no evidence was presented at trial, and the evidence

23   that I did see is very much inconsistent with that having

24   happened.

25          In summary, after two days of testimony, all I

```
 1  know is the relationship ended on April 13th and no-

 2  contact orders.  I don't even know, and I don't

 3  necessarily need to know, why either one or both of them

 4  have chosen not to pursue one another since April 13th.

 5  Perhaps some of it is because of the stay-away orders, but

 6  it certainly didn't end because, what's done to the

 7  evidence for me of any sort of physical fighting or

 8  assaults by Mr. Pensiger.

 9          So, I have Mr. Pensiger trying to give her

10  flowers on April 29th and writing her what could only be

11  viewed as a kind and supportive and nonthreatening letter.

12   So, it's not even a close call.  The Court does not find

13  that Mr. Pensiger committed the crime of stalking, and I

14  will be denying Ms. Minelli's request for a civil

15  protection order by him, because I have no evidence that

16  he committed a crime.

17          Because the parties are young, I want to take

18  the opportunity to just talk to them about the fact that,

19  and I think I alluded to this earlier, there's all kinds

20  of things that people can do or say to one another that

21  are awful.  One has to only listen to the news every day

22  to know that people in positions of power say nasty racist

23  things and horribly hurtful things.  A lot of those aren't

24  crimes, though, and when people's relationships end, it is

25  common that both people, but oftentimes one person far
```

1   more than the other, are emotionally upset and hurt about

2   it.

3          The fact that a person is emotionally upset or

4   hurt, doesn't feel like the other person was as supportive

5   as they'd like to, doesn't mean the other person committed

6   a crime.  It doesn't give them the right to hit them.  I

7   don't understand why it leads that person to try to have

8   the other kicked out of college.

9          What I'm going to suggest that the parties do,

10  I mean the situation as it now stands, is that Ms. Minelli

11  is being ordered by me to stay away from Mr. Pensiger and

12  not contact him in any manner except through attorneys,

13  but it makes me very sad to know where these parties now

14  stand, because these are two young people, 19 and 20 years

15  old, who are obviously incredibly bright -- I can't

16  imagine how difficult it is to get accepted into

17  Georgetown University -- that both were very much

18  respectful in the court.  I'm sure they have bright

19  futures ahead of me, and I'm sure this whole thing has

20  been very upsetting.

21          And so, I'm going to just suggest that the

22  parties consider whether their actions -- I won't be a

23  part of that unless you all come back to court and ask me

24  to do something.  What I'm going to suggest would involve

25  asking me to come back to court and do something, but it's

1   totally up to you all.  Ms. Minelli is obviously upset

2   because she's now been issued a stay-away order, and a

3   judge has concluded that she assaulted someone four times.

4           Mr. Pensiger is upset because he's afraid he's

5   not going to be able to get into Georgetown, and he's not

6   going to be able to get back to Georgetown, and he's

7   afraid Ms. Minelli and her family are going to continue to

8   go after Georgetown to try to get him booted out of

9   school.  What to me would be good is if Mr. Pensiger can

10  get to a point where's he's able to go back to school,

11  since, from my view, I don't believe he's committed any

12  crime -- I didn't even see evidence of unkind words, to be

13  honest, in those conclusory statements that he said mean

14  things.  Ms. Minelli obviously doesn't want to have a

15  civil protection order against her.

16          So, what I'm going to suggest, and it's

17  obviously up to you, this is what I was trying to hint at

18  you all yesterday to consider doing, was to see if there's

19  a way you can get to a point close to where you were in

20  August but slightly different, because I don't think that

21  was a good solution either, despite the very good best

22  efforts I'm sure of the attorneys.

23          I would think that if Mr. Pensiger was able to

24  go back to Georgetown and Ms. Minelli didn't have any

25  civil protection order against her, I really do think both

1   of them could move on well with their lives.  What I would
2   suggest is that they come to a point where neither has a
3   civil protection order against each other, neither has a
4   stay-away within Georgetown, because it doesn't --
5   certainly Ms. Minelli, on the evidence I've heard, doesn't
6   need on, and Mr. Pensiger, while I'm sure he didn't like
7   getting hit, I don't think he's probably as much concerned
8   about getting beat up by Ms. Minelli as he is that he's
9   not sure he's going to be able to go back to the college
10  that he wants to go to and he's already spent two years
11  at.
12          No agreements where people are paying five-
13  thousand dollars if they violate agreements or pay an
14  attorney's fees, so, again, this is only if you all, but
15  I'm just hoping that parties will realize that enough is
16  enough.  I'm sorry most of this is directed at Ms.
17  Minelli, because, at least in the court's view, she's the
18  one that been pushing this.
19          I'm sure you've been hurt, Ms. Minelli, by what
20  has happened, but there isn't evidence that Mr. Pensiger
21  committed a crime, and there's nothing presented to me,
22  maybe other things were presented to Georgetown, that
23  should result in him not going to Georgetown, and I can't
24  imagine that there's any reason he's just been suspended
25  other than you and your family trying to make that happen.

1

2              And so, it would have to involve, as I said, to

3    me, the just end result would not be limits on writing one

4    letter or even anyone having no-contact orders, because I

5    really don't perceive either of these parties as a huge

6    threat to one another.  I stand by my decision that

7    absolutely Mr. Pensiger is entitled to a civil protection

8    order because he has been the victim of an assault, albeit

9    not a serious one.  Obviously, it would be up to him as

10   well as Ms. Minelli if they both agree to this.  If you

11   can get to a point where's no CPO against you, he gets to

12   go back to Georgetown, nobody has to worry about stay-away

13   orders, I really do think these folks can move on with

14   their lives.

15              And, so, it would have to involve counsel

16   moving to vacate the order, and Mr. Pensiger agreeing to

17   vacate it, and obviously you don't have to agree to

18   anything, just like Ms. Minelli doesn't have to.  What's

19   in it for you, and what I'm suggesting, is that they would

20   agree, as they did in another agreement to not pursue

21   Title IX claims or any other claims to try to get you

22   suspended or kicked out, you wouldn't pursue those against

23   her, and both of you would still reserve the right, in the

24   future, if one of you assaults the other, threatens the

25   other, or commits a crime, you can obviously go back to

1    court and ask for a civil protection order, and you could

2    go back to Georgetown and ask for sanctions against the

3    other party.

4           So, I'm suggesting that that might be the best

5    way for the parties to move on.  I just find it so

6    unfortunate that I think -- Ms. Minelli, I know you're

7    only 19 years old, and I know what it's like to be 19 and

8    you're not totally free and independent from your parents,

9    but to the extent you've been pushed by other family

10   members to pursue this, you've been given bad advice and

11   bad judgment, because it's pretty clear on what evidence

12   was going to be presented, you were not going to win this

13   case.

14          You were essentially going to be found to have

15   assaulted him, and he was not going to be found to have

16   stalked you, and the attorneys, again, they're doing the

17   best they can and did an excellent job on your behalf, but

18   what I've learned in more than 30 years of being around a

19   courthouse is that most cases aren't because lawyers are

20   good or bad.  I mean, they can make a difference, but

21   mostly it's the evidence.

22          And the evidence in this case does not support

23   the finding of a crime by Mr. Pensiger, and so it's just a

24   terrible shame that Georgetown has had police officers

25   following your around campus for months and your parents

1  have been following you around campus.  If anything, I'm
2  sure that added to your distress and made it seem worse
3  than what was really going on.  Again, unless there's
4  something that, for reasons that would be baffling to me,
5  you chose not to tell me about all the crimes that Mr.
6  Pensiger had committed.  And so, to the extent that you
7  were encouraged to file court papers, to the extent that
8  you were encouraged to try to get him kicked out of
9  Georgetown, I think it would have been best if the other
10 adults would have said, Honey, I love you, and I know that
11 you've been through a lot in this relationship, but I
12 don't think this is the kind of situation where we should
13 be trying to kick another young person out of school, or
14 we should be trying to get them have a restraining order,
15 or we should be calling the police.

16        And so, I'm not asking you all to respond, and
17 I don't want you to respond to my suggestion that there is
18 a way, I think, to make the situation better, even though
19 it's been made worse.  I mean, we, at least, I feel I've
20 made the right call in my case, but I care about the
21 people that are here in front of me, and it makes me sad
22 to think that after you all leave, are we now going to
23 have another fight at Georgetown about, Mr. Pensiger
24 should be kicked out?  I just don't know where that's
25 going to help Ms. Minelli.

1          That's why I hope that you all will consider

2   what I encouraged you to consider yesterday but was told

3   within, like, less than a minute, you had rejected and

4   came back to the courtroom, telling me, let's go forward

5   with the trial.  That's okay.  Now you know what my

6   decision is.  Ms. Minelli has an interest in getting rid

7   of a civil protection order.  Mr. Pensiger has an interest

8   in getting back to Georgetown.  You both have promising

9   futures, and I hope that you will conduct yourselves in a

10  way that helps those futures.

11         Unfortunately, what has been done, and I think

12  a lot of this is that Ms. Minelli is under pressure by

13  other people.  Those people have made Ms. Minelli's

14  situation worse.  They haven't helped her.  They've caused

15  her and Mr. Pensiger an enormous amount of emotional

16  stress by coming to court hearings, going to speak to

17  Georgetown police officers, having to go through Title IX

18  actions over what, on the evidence before me, is a

19  breakup, which, I don't even know why the parties broke

20  up, but I think they both want to break up.

21      So, I will, Ms. Minelli, the last thing I have to

22  make sure to do is to tell you that for a period of one

23  year, you have to stay at least 100 yards away from Mr.

24  Pensiger, his home, his workplace, his vehicle, and not

25  contact him in any manner except through counsel.  If the

1  parties are in class together, in case you all end up both

2  at the same college, you try to stay at least 20 feet away

3  from him.  If you were to violate the order, you would

4  face possibly up to 180 days in jail and a fine of a

5  thousand dollars.

6           It's unlawful to possess any firearms in the

7  District of Columbia once a civil protection order has

8  been entered.  I'm not asking you, and I don't ask anyone

9  if you do possess firearms, but if you do, you would need

10 to turn them in to law enforcement.

11          Does anyone have questions about what the court

12 has ordered?  All right.  So, Ms. Ruiz will scan the civil

13 protection order into the court's records, and we'll give

14 each of you a copy, and then you can be on your way.  Best

15 of luck to you.  Maybe I'll see you again, if you end up

16 coming to an agreement along some of the terms that I've

17 suggested.  I hope that you do, because I feel very

18 confident.

19          I can't predict the future, but I feel pretty

20 sure that both of your lives will be better if Mr.

21 Pensiger is able to go back to school and you stop

22 pursuing litigation against him.  Good luck to your both.

23          MR. VINICK:  Thank you, Your Honor.

24          MS. CARMONA:  Thank you.

25          THE COURT:  Thank the counsel for the job you've

1   done with the case.

2            MS. MINELLI:   Thank you.

3            MR. PENSIGER:   Thank you.

4            (Whereupon the proceeding ended.)

√   Digitally signed by Judith L. Stromoski


                    ELECTRONIC CERTIFICATE

        I, Judith L.Stromoski, transcriber, do hereby

certify that I have transcribed the proceedings had and

the testimony adduced in the matter of JARON PENSIGER vs.

MADISON MINELLI, Case No. 2019 CPO 003698 in said Court,

on the 13th day of September 2019.

        I further certify that the foregoing 48 pages

constitute the official transcript of said proceedings as

transcribed from audio recording to the best of my

ability.

        In witness whereof, I have hereto subscribed my

name, this 30th day of September 2019.




                    _Judith L. Stromoski_

                    Judith L. Stromoski

                        Transcriber

# EXHIBIT B



**GEORGETOWN UNIVERSITY**
**DEPARTMENT OF PUBLIC SAFETY**
**VILLAGE C WEST 116 - 37TH AND O STREET NW**
**WASHINGTON, DC, 20057**

INCIDENT REPORT

Reported by:   **OFC. D. FLOYD**

| Incident Type | | Subject |
|---|---|---|
| **ADMINISTRATIVE : Sexual Assault (INCIDENT)** | | **PENSINGER, JARON ROBERT (SUBJECT)** |
| **ADMINISTRATIVE : Sexual Misconduct (INCIDENT)** | | **PENSINGER, JARON ROBERT (SUBJECT)** |
| **ADMINISTRATIVE : Harassment (INCIDENT)** | | **PENSINGER, JARON ROBERT (SUBJECT)** |
| **ADMINISTRATIVE : Incivility with University Official (INCIDENT)** | | **PENSINGER, JARON ROBERT (SUBJECT)** |
| **ADMINISTRATIVE : Failure to comply (INCIDENT)** | | **PENSINGER, JARON ROBERT (SUBJECT)** |
| **Incident : Distraught Person/Student (INCIDENT)** | | **PENSINGER, JARON ROBERT (SUBJECT)** |

| | Method of Reporting | | Related Number: |
|---|---|---|---|
| | **RADIO** | | **2019-04-13-09755** |
| Reporting Officer | Manager/Supervisor On Duty | | Manager/Supervisor Notified |
| **OFC. D. FLOYD** | **SGT S. CONNER** | | **YES** |
| Incident Started | Incident Ended | | Incident Reported Date |
| **04/13/2019 at 2030** | **04/14/2019 at 0020** | | **04/13/2019 at 2149** |

| Location | | Specific Location | |
|---|---|---|---|
| **MAIN CAMPUS : BEAT 5 : SOUTHWEST QUAD : MCCARTHY HALL : 7th Floor** | | **ROOM 718** | |
| Secondary Location | | Related Event | |
| | | **See report 19-000534** | |

Report Synopsis/Overview

**\*\*\* Dispatch Information \*\*\***

**Dispatch Initial Call Type: DISTRAUGHT STUDENT**
**Dispatch Final Call Type: DISTRAUGHT STUDENT**

**Officer Times (userid: dis/enr/arr/clr):**
**DYLAN FLOYD (DF706): 2151/2151/2154/0020**

**ERIC DORCEY (EMD92): 2151//2154/0020**

**SCOTT CONNER (SC1342): 2151/2151/2154/0020**

**Reporting Person Information:**
   **MADISON MINELLI**
   **Reporting Person Phone: 5613391040**

| Prepared By: OFC. D. FLOYD(df706) | | Submitted Date 04/20/2019 1445 |
|---|---|---|
| Signature | | Reviewed By/Date |
| | | CAPT G. HILTON 04/22/2019 1527 |

**Dispatch Notes:**
**4/13/2019 10:21:37 PM : SBC32**
**CDOD will arrive in approximately 10 minutes**

**4/13/2019 10:19:06 PM : SBC32**
**GUPD Comm Center contacted CDOD Tom Mangano.**

**4/13/2019 9:54:04 PM : SBC32**
**Jalan Eansineur according to caller is appearing to act erratically, and posbily suicidal. GUPD responding to location at this time.**

**\*\*\* Dispatch Information End \*\*\***

| Contact # 1 (VICTIM) | | | |
|---|---|---|---|
| **Full Name** | | | |
| **MADISON MINELLI** | | | |

| GUID | | DL State | | Email Address | |
|---|---|---|---|---|---|
| **829162651** | | | | **MAM749** | |
| Age | Date of Birth | Gender | | Race | |
| **19** | **11/24/1999** | **F** | | **W - WHITE** | |
| Height | Weight | Hair Color | | Eye Color | |
| | | **BLONDE** | | **BLUE** | |
| Approx. Age | Demeanor | Build | | Clothing | |
| | **CALM** | | | | |
| Department | | | | Title | |
| | | | | **GU STUDENT** | |

| Addresses | | | | | | | |
|---|---|---|---|---|---|---|---|
| Street Number | Street Direction | Street/Res Hall Name | | | | Street Type | Apt./Room # |
| **3620** | **NORTHWEST** | **PROSPECT** | | | | **STREET** | |
| City | | State | | Zip | Country | | Address Type |
| **WASHINGTON** | | **DC** | | **20007** | | | **HOME** |

| Phones : | |
|---|---|
| **(CELL) 561-339-1040** | |

| Contact # 2 (WITNESS) | | | |
|---|---|---|---|
| **Full Name** | | | |
| **CAROLE SUSAN MINELLI** | | | |

| GUID | | DL State | | Email Address | |
|---|---|---|---|---|---|
| | | **VA** | | | |
| Age | Date of Birth | Gender | | Race | |
| **80** | **09/28/1938** | | | | |
| Department | | | | Title | |
| | | | | **NON-AFFILIATE** | |

| Addresses | | | | |
|---|---|---|---|---|
| Street Number | Street Direction | Street/Res Hall Name | Street Type | Apt./Room # |
| | | | | |

| Prepared By: | Submitted Date |
|---|---|
| OFC. D. FLOYD(df706) | 04/20/2019 1445 |
| **Signature** | **Reviewed By/Date** |
| | CAPT G. HILTON 04/22/2019 1527 |

| Contact # 3   (WITNESS) |
| --- |

**Full Name**

**TOM  MANGANO**

| GUID | | DL State | Email Address | |
| --- | --- | --- | --- | --- |
| 826276523 | | | TM1311@GEORGETOWN .EDU | |

| Age | Date of Birth | Gender | Race | |
| --- | --- | --- | --- | --- |
| 26 | 10/05/1992 | M | W - WHITE | |

| Department | | | Title | |
| --- | --- | --- | --- | --- |
| | | | CDOD / DARNALL HALL | |

| Addresses | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Street Number | Street Direction | Street/Res Hall Name | | | Street Type | Apt./Room # |
| | | | | | | |
| City | State | Zip | | Country | | Address Type |
| WASHINGTON | DC | | | | | |

| Phones : |
| --- |
| (CELL) 201 469 7662 |

| Contact # 4   (SUBJECT) |
| --- |

**Full Name**

**JARON ROBERT PENSINGER**

| GUID | | DL State | Email Address | |
| --- | --- | --- | --- | --- |
| 832054332 | | PA | | |

| Age | Date of Birth | Gender | Race |
| --- | --- | --- | --- |
| 19 | 05/02/1999 | M | |

| Addresses | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Street Number | Street Direction | Street/Res Hall Name | | | Street Type | Apt./Room # |
| | | | | | | |
| City | State | Zip | | Country | | Address Type |
| | | | | | | HOME |
| Street Number | Street Direction | Street/Res Hall Name | | | Street Type | Apt./Room # |
| | | MCCARTHY HALL | | | | 718 |

| Phones : |
| --- |
| (CELL) 717-491-6532 |

| Digital Media List |
| --- |
| |

| Prepared By: OFC. D. FLOYD(df706) | Submitted Date 04/20/2019 1445 |
| --- | --- |
| Signature | Reviewed By/Date CAPT G. HILTON 04/22/2019 1527 |

**Digital Media # 1**



**Title**

**SUBJECT'S TEXT TO SURVIVOR**

**Description**

**Injury**

**Narrative text**

On Saturday, 04/13/2019 at approximately 2149 hours, I, Ofc. Floyd responded to McCarthy Hall 718, for the report of a distraught student experiencing suicidal ideation. While enroute Sgt. Conner and I stepped-up our response from the lobby area after the dispatcher advised over the radio that he heard shouting in the background and advised that the person is becoming increasingly agitated. Upon arrival, we made contact with the subject, Jaron Pensinger (GU student) and survivor, Madison Minelli (GU student). Sgt. Conner and I separated the two individuals and interviewed them. Sgt. Conner interviewed the subject in his room, McCarthy 718. Meanwhile, I interviewed Miss Minelli in the common room of the 7th floor. Officer Dorcey and Officer Wood arrived on scene to assist.

The subject told Sgt. Conner that he and Miss Minelli are in a romantic relationship and that they had been arguing over a photo that Miss Minelli posted online. He stated he did not want her to leave and that if she did leave, that he would not be there when she got back. He told Sgt. Conner that he insinuated toward committing suicide to get her to stay but never made the statement that he was going to kill himself.

Meanwhile I spoke with Miss Minelli. She confirmed the same story with minimal differences but added details. She stated that the argument began at approximately 2030 hours with the subject becoming angry that his photo with her was not the first in the series of the 3 photos that she had posted online. They began a verbal dispute from there and the subject became verbally abusive. She stated that she wanted to leave and be left alone and the subject began yelling at her, telling her that she cannot leave and blocking her path, he began calling her names and telling her that he was going to kill himself if she leaves him. She then texted her grandmother, Carole Minelli (witness), to come and pick her up because she feared for her safety. She then called GUPD to report the subject's suicidal ideation because she wanted to help the subject.

Miss Minelli then stated that the subject is not only verbally abusive on a daily basis but approximately a week ago, on 04/05/2019 at approximately 2130 hours, the subject had "sexually abused" her. Miss Minelli's grandmother arrived on scene and she stated, she felt better having her in the room with her while we continued our interview. I forewarned Miss Minelli that the questions may be invasive and graphic and she acknowledged and wanted to proceed with the interview. She stated that it was not the first time that she had been sexually assaulted, but it was the first time she was reporting it.

I informed Miss Minelli that I am a mandatory reporter and explained what that meant. She continued after acknowledging. She stated, she and the subject were "making-out" and were going to have sex, but after removing her clothes, Miss Minelli decided she no longer wanted to engage in intercourse and verbalized this to the subject. Mr. Pensinger then forced his penis into her vagina and grabbed her breasts. She stated that she screamed and told him to stop but he continued thrusting and

| Prepared By: | Submitted Date |
|---|---|
| OFC. D. FLOYD(df706) | 04/20/2019 1445 |

| Signature | Reviewed By/Date |
|---|---|
| | CAPT G. HILTON 04/22/2019 1527 |

engaging in vaginal intercourse with her. She recalled him saying, "If you love me, you'll let me keep going." The survivor stated, she screamed at him to stop. He did not stop until he ejaculated. The survivor spoke with the subject, and told him that he had raped her, but the subject stated that he wasn't a rapist because she changed her mind while they were already having sex and told her not to be so dramatic about the incident. He stated, "If you report me to the police as a rapist, I will tell them that you physically abuse me."

The survivor spoke with a Staff Psychologist at CAPS, Engin Ege Ontiveros, whom she had been seeing regularly, along with a psychiatrist, Dr. Matt Flemming. She told her that she "was raped by her boyfriend" (Mr.Pensinger) and they all set up an appointment to speak in a session together. In the session after the "rape", they discussed that the couple would not be physically intimate with each other until the survivor felt comfortable doing so again. Miss Minelli tried to stay away from the subject from that meeting forward. The subject never apologized for sexually assaulting her nor for the verbal abuse, nor expressed remorse in any way. She told the subject in front of the counselor that she is afraid of him. Miss Minelli spoke with the on-call CAPS counselor while on scene, who by chance, happened to be Dr. Ontiveros. She told Dr.Ontiveros that she just couldn't take it anymore and that she feared for her safety. In the conversation with Dr. Ontiveros, she stated that the subject told her in her argument earlier that night, "I see why your other boyfriend's cheated on you and hurt you." She told the counselor that she only called the police because she was worried he was going to hurt himself tonight and just wanted to get him help, as well as feared for her own safety. She stated that she felt guilty for getting him into trouble in anyway but is too afraid for her safety to continue taking his emotional, psychological, and sexual abuse.

After she was "raped" (sexually assaulted), the survivor had visible markings of forced trauma between her legs on her upper thighs. Her mother and grandmother noticed the markings and she confessed the details of her sexual assault to them. She stated that she was bleeding from her vagina after she was sexually assaulted by the subject on April 5th, as well as in physical pain. The survivor stated that the subject verbally abuses her and harasses her multiple times a day. He has since the beginning of their relationship. The extent of their romantic relationship has consisted of approximately 4 months. The sexual abuse has happened at least three times and began with forceful touching until it escalated to penetration on April 5th. She stated that she knew she was no longer safe being around him after the incident. She has seen the subject lose his temper many times and it has scared her.

I spoke with the survivor about the options of many resources and told her who would be in contact with her to follow up. The survivor stated that she has a good relationship with Carol Day and wants to speak with her regarding the incident. I gave the survivor the options for filing a criminal complaint, a formal student conduct complaint, both, or neither. I explained each of them and answered her questions. Additionally, I had the survivor speak with Sgt. Johnson and he explained the University no contact order process, the temporary protective order process, as well as the MPD Sexual Assault Unit response. Miss Minelli stated that she wanted to start with the university no contact order and filing a formal complaint with student affairs . She stated that she may want to go the criminal route later if the subject fails to comply with the university no contact order or if she feels that she needs more protection, as she was concerned the subject would show up at her home, her grandmother's or her mother's home.

The survivor stated that she does not want to see the subject again and feels unsafe in his presence. She stated that they have a class together and that they volunteer at the Holy Trinity Church on 36th Street together. I informed her that we would come up with and implement a safety plan for her as well as put in place the university no contact order for her tomorrow, accompanied by the report and notification to Title IX, Student Affairs and Student Conduct.

Officer Dorcey arrived on scene and accompanied the subject while Sgt . Conner made proper notifications and passed information back and forth to corroborate each party's story. Ofc.Dorcey told the subject that he is no longer allowed to communicate in any way shape or form with Miss Minelli or her family members and that he is to stay away from them. He replied, asking if he could text her again and asked if there was any law that would keep him away from her tonight until the official no contact order notification was made the next morning . He was again advised to stay away and refrain from contact with any of the Minelli family.

Miss Minelli then informed me that the phone, phone number, and cellular service the subject is using is paid for by her mother and that they want the phone back. I informed Ofc. Dorcey, and told him to ask the subject to voluntarily return the

| Prepared By: | Submitted Date |
|---|---|
| OFC. D. FLOYD(df706) | 04/20/2019 1445 |

| Signature | Reviewed By/Date |
|---|---|
| | CAPT G. HILTON 04/22/2019 1527 |

phone to the rightful owner, but the subject refused to give Ofc. Dorcey the phone. He then sent a text to the survivor (see attached digital media). Additionally, he began texting the survivor's mother, stating that the phone was his and telling her to " get a warrant". I informed the Minelli women that we needed the formal documentation of the rights of ownership of the phone, service, and phone number being under the survivor's mother's account so that we can obtain a further options to retrieve the phone. The survivor stated that she would ensure her mother and Sgt. Johnson would speak and that she would send in the requested documents in order to prove its ownership to the Minelli's.

Additionally, the CDOD arrived on scene and spoke to both parties, reiterating all of the above information we provided above and ensuring additional support and assistance to the survivor. Due to the allegations of suicidal ideation for the subject, officers had the subject speak to CAPS. The subject became increasingly agitated and defiant of GUPD officials as the time continued on scene. Officers reiterated to the subject to stay away and not to contact the Minelli's. Officers then walked the survivor and her grandmother downstairs to their vehicle at which time the survivor and her grandmother both thanked GUPD before departing.

All units cleared the scene at 0020 hours.

Sgt. Conner made the proper notifications for a sexual assault to GUPD Command Staff, Jeanne Lord, Carol Day, Katie Boin and Jen Schweer.

Nothing further to report.

| Prepared By: | | Submitted Date |
|---|---|---|
| OFC. D. FLOYD(df706) | | 04/20/2019 1445 |
| **Signature** | **Reviewed By/Date** | |
| | CAPT G. HILTON 04/22/2019 1527 | |

Case # :   19-000522_1



**GEORGETOWN UNIVERSITY**
**DEPARTMENT OF PUBLIC SAFETY**
**VILLAGE C WEST 116 - 37TH AND O STREET NW**
**WASHINGTON, DC, 20057**

SUPPLEMENT

Reported By:   **OFC. D. FLOYD**

| Parent Report Information | | |
|---|---|---|
| Report Type | Reference Number | Tracking Number |
| **INCIDENT REPORT** | **19-000522** | **328786** |
| Report Recorder | Report Disposition | |
| **OFC. D. FLOYD** | | |

| SUPPLEMENT Information |
|---|
| Report Disposition |
| **SEE REPORT** |
| Synopsis |
| Follow up meeting with the survivor. |

| Contact # 1   (SUBJECT) | | |
|---|---|---|
| Full Name | | |
| **JARON ROBERT PENSINGER** | | |
| GUID | DL State | Email Address |
| **832054332** | **PA** | |
| Age | Date of Birth | Gender | Race |
| **19** | **05/02/1999** | **M** | |

| Addresses | | | | | | | |
|---|---|---|---|---|---|---|---|
| Street Number | Street Direction | Street/Res Hall Name | | | | Street Type | Apt./Room # |
| | | **MCCARTHY HALL** | | | | | **718** |
| City | | State | Zip | | Country | | Address Type |
| | | | | | | | **HOME** |
| Street Number | Street Direction | Street/Res Hall Name | | | | Street Type | Apt./Room # |
| | | **MCCARTHY HALL** | | | | | **718** |

| Phones : | |
|---|---|
| Type | Number |
| **CELL** | **717-491-6532** |

| Contact # 2   (VICTIM) | | |
|---|---|---|
| Full Name | | |
| **MADISON  MINELLI** | | |
| GUID | DL State | Email Address |
| **829162651** | | **MAM749** |
| Age | Date of Birth | Gender | Race |
| **19** | **11/24/1999** | **F** | **W - WHITE** |

| Prepared By: OFC. D. FLOYD(df706) | Submitted Date 04/20/2019 1445 |
|---|---|
| Signature | Reviewed By/Date |
| | CAPT G. HILTON 04/25/2019 1145 |

| Height | Weight | Hair Color | | Eye Color | | | |
|---|---|---|---|---|---|---|---|
| | | **BLONDE** | | **BLUE** | | | |

| Addresses | | | | | | | |
|---|---|---|---|---|---|---|---|
| Street Number | Street Direction | Street/Res Hall Name | | | | Street Type | Apt./Room # |
| **3620** | **NORTHWEST** | **PROSPECT** | | | | **STREET** | |
| City | | State | Zip | | Country | | Address Type |
| **WASHINGTON** | | **DC** | **20007** | | | | **HOME** |

| Phones : | |
|---|---|
| Type | Number |
| **CELL** | **561-339-1040** |

| Contact # 3   (WITNESS) |
|---|

| Full Name |
|---|
| **CAROLE SUSAN MINELLI** |

| GUID | | DL State | | Email Address | |
|---|---|---|---|---|---|
| | | **VA** | | | |

| Age | Date of Birth | Gender | | Race | |
|---|---|---|---|---|---|
| **80** | **09/28/1938** | | | | |

| Addresses | | | | | | |
|---|---|---|---|---|---|---|
| Street Number | Street Direction | Street/Res Hall Name | | | Street Type | Apt./Room # |
| | | | | | | |

| Contact # 4   (WITNESS) |
|---|

| Full Name |
|---|
| **ELIZABETH M MINELLI** |

| GUID | | DL State | | Email Address | |
|---|---|---|---|---|---|
| | | **FL** | | | |

| Age | Date of Birth | Gender | | Race | |
|---|---|---|---|---|---|
| **54** | **12/09/1964** | | | | |

| Notes |
|---|
| **GOES BY "BETSY"** |

| Addresses | | | | | | |
|---|---|---|---|---|---|---|
| Street Number | Street Direction | Street/Res Hall Name | | | Street Type | Apt./Room # |
| | | | | | | |
| City | | State | Zip | | Country | Address Type |
| | | | | | | **HOME** |

| Digital Media List |
|---|
| |

| Prepared By: | Submitted Date |
|---|---|
| OFC. D. FLOYD(df706) | 04/20/2019 1445 |

| Signature | Reviewed By/Date |
|---|---|
| | CAPT G. HILTON 04/25/2019 1145 |

**Digital Media # 1**



Title
**PHONE INFO**

Description

**Digital Media # 2**



Title
**MINELLI LEG BRUISE 9 DAYS AFTER INCIDENT**

Description

---

Narrative text

On Sunday, 04/14/2019 at approximately 1645 hours, I, Ofc. Floyd responded to 3620 Prospect St. NW Washington, DC. to meet with survivor, Madison Minelli (GU Student), to follow up with her regarding her report of sexual assault the day prior.

Miss Minelli informed me that she and the subject had spoken before the no contact order went into place but that she blocked his number from her phone once she received the notice of the order. She informed me that the subject violated the no contact order by texting her mother, Betsy Minelli, who resides in Florida. The message asked for Betsy to release the phone number that he was using so that he can start service back on the phone, after Betsy discontinued the service she had been paying for on the device. She did not respond to his message. She stated that she still wants the phone back. Betsy was placed on speaker phone and included in this conversation and stated, she asked the subject to return the phone to her months ago and the subject never answered her texts. When she asked the survivor to bring it up to him, the subject became irate and belligerent with the survivor and her family. The survivor stated, "He brought back clothes and other items and left them on her doorstep and garage entryway with aggressive notes." One note stated, "Don't let your mom spend another dime on me!", and included clothing that was bought as a gift for him. The only item that was not a gift that was given to him temporarily was the phone. The mother Betsy, stated that she felt uncomfortable putting him on their family plan but did it because her daughter asked her to. She felt it was too early in their relationship to be adding him to their cell phone plan. Additionally, Betsy provided me with the phone documents (see attached scanned PDF).

Prior to this event earlier this day, beginning at approximately 1415 hours and ending at approximately 1520 hours, I was speaking about the case to Sgt. Johnson. During which time, our conversation was interrupted with a phone call from the subject. The subject asked questions about the no contact order. Additionally, he continued to ask if he would be in legal trouble or able to be arrested if he were to show up at her house and talk to her. Sgt. Johnson reiterated that the no contact order is not criminal but administrative through the school and that he will be referred to student conduct and possibly suspended or expelled from school. This conversation lasted via phone for over an hour. Sgt. Johnson had to repeatedly tell the subject at least 5 times that he is not to contact the survivor in any way, shape or form.

The survivor informed me that the subject used to show up at her house on prospect street at 2 or 3 am asking to see the survivor

---

| Prepared By: | | Submitted Date |
|---|---|---|
| OFC. D. FLOYD(df706) | | 04/20/2019 1445 |
| **Signature** | **Reviewed By/Date** | |
| | CAPT G. HILTON 04/25/2019 1145 | |

but her grandmother, whom also resides there, would not allow him to come in and as a result he became verbally abusive to her and texted the survivor expressing his anger for this. He would then call her mother and yell at her about having the survivor talk to him. She fears that he will show up at her home, classes, and that the subject will stalk and harass her and eventually hurt her again. She fears for her safety and stated that she feels that she will not be able to focus on her classwork in the shared class that they are in on Tuesdays and Thursdays in Walsh from 1530 to 1645 hours. She requested that a plain clothes officer sit in on the class for the remaining duration of the semester. Additionally, she requested that an officer escort her to her classes for this week until after the winter break and see what her comfort level is then. She asked for a plain clothes officer for the escorts, but stated that a uniformed officer would be fine as long as they are in proximity but not drawing obvious attention to her during the escort .

Additionally, she has a summer session with the subject from May to mid June which she is worried about.I spoke with the survivor regarding further options of getting the phone back, including having her mother report it stolen and then GUPD writing an arrest warrant for him for theft. Additionally, I stated we could further report this to student conduct, to which she agreed and asked to move forward with student conduct before she wants to move forward with the criminal route. The subject is reportedly travelling to Russia for the summer after completing the pre-summer session class, but only if he finds a residence to stay at out there.

I informed the survivor that tomorrow an officer would be there to escort her to her classes in plain clothes and that I would notify her of whom would be arriving if it were not me. I arranged for Sgt. Halpren-Ruder to provide the escorts. Additionally, Betsy Minelli will be arriving at approximately 1400 hours and the survivor requested that she and her mother meet with me again. I agreed and asked that Sgt. Halpren-Ruder be present for this as well to better explain, inform, and prepare the survivor with what the next steps will be in the process of the investigation. The survivor provided me with an image of what was formerly a bruise on her upper leg due to the forced sexual assault on April 5, 2019, approximately 10 days ago (see image attached).

Nothing further to report at this time.

| Prepared By: OFC. D. FLOYD(df706) | Submitted Date 04/20/2019 1445 |
|---|---|
| Signature | Reviewed By/Date |
| | CAPT G. HILTON 04/25/2019 1145 |

# EXHIBIT C

(no subject)  Necessary Information ×

**Madison Minelli** <mam749@georgetown.edu>                    Mon, Apr 8, 2019, 4:02 PM

to me ▾

Hey. I have tried to text you a few times and it appears as if I have been blocked from texting and calling you. I know you wanted to not talk for a week but I did not know that entailed blocking and unfollowing me. I am very hurt by this.

I just want you to know that I really miss you. I don't know exactly what I am looking for from this email... I guess I just want to know that you miss me, too.

I have had anxiety about seeing you in class tomorrow. I hope that you will still sit next to me and be cordial.

It's been hard for me seeing you doing fun things like parties and going to the monuments without me. It makes me feel like I did something wrong when all I was doing was removing myself from a potentially-triggering situation for a short amount of time. I hope you will come to understand this and realize that it was not a result or reflection of you as a boyfriend. I have been going to therapy and I hope you will also understand that I am taking the necessary steps to grow from my past traumas.

It was hard for me to see Brett over the weekend and for my text to you about that not go through. It was also hard sitting next to Dylan in psychology today, not knowing what to say and starting to cry when he looked away. It is even harder when people ask me how you and I are and I just look at them and turn away, not knowing what to say.

I don't know if this is hard for you or not because I haven't heard from you, but it has been a lot on me. I went from talking and being with you all day every day to now being blocked so I cannot talk to you and not seeing you at all. You were my best friend and my heart is so sad and heavy over this.

I hope to hear back from you.


Love always,
Maddy

# EXHIBIT D

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**DOMESTIC VIOLENCE UNIT**

**Madison Minelli**
3620 Prospect Street NW
Washington, DC 20007
        **Petitioner,**

        v.                                    CPO No: 2019 CPO 1676

**Jaron R. Pensinger**
Georgetown University
McCarthy Hall, Apt. 718
Washington, DC 20057
        **Respondent.**

## PETITION AND AFFIDAVIT FOR CIVIL PROTECTION ORDER

        COMES NOW, the Petitioner Madison Minelli respectfully submits this Petition and Affidavit for Civil
Protection Order pursuant to SCR-DV Rule 2(b). Petitioner respectfully requests that the court issue a 12-month
Civil Protection Order against Respondent pursuant to D.C. Code Section 16-1001 et seq. In support of thereof
request, Petitioner states:

1. Respondent is related to Petitioner by ☐ Blood; ☐ Legal Custody; ☐ Marriage; ☐ Domestic Partnership;
   ☐ Having a Child in Common; ☐ Now or Previously Having Shared the Same Residence; ☒ Romantic,
   Dating, or Sexual Relationship; ☐ Stalking; ☐ Sexual Assault; ☐ Sharing a common intimate partner (§16-
   1001(6)(B)

2. Do you reside, live, work or attend school in the District of Columbia? ☒ Yes ☐ No

3. Did any incident described below occur in the District of Columbia? ☒ Yes ☐ No

4. Respondent committed or threatened to commit an act punishable as a criminal offense against Petitioner
   within the meaning of D.C. Code Section 16-1001 et seq., by: *(Please describe any such acts, including
   physical assaults like hitting, punching, shoving or kicking; threats to do harm, or destruction of property).*

**A. On or about April 5, 2019 at or around 9:00 p.m.**
At Location: Georgetown University, McCarthy Hall, Apt. 718, Washington, DC 20057
Respondent made sexual advances on Petitioner. Petitioner told Respondent repeatedly that she did not want to
have sex with Respondent. Respondent physically forced Petitioner to have sex with him. Petitioner sustained
bruising and vaginal bleeding. Respondent told Petitioner that if she told anyone about the incident he would lie
and say that Petitioner had physically abused him. Petitioner feared for her safety.

**B. On or about April 26, 2019 at or around 5:00 p.m.**
At Location: Washington, DC via text message
Petitioner had previously informed Respondent that she did not want to have any contact with him. Respondent
contacted Petitioner via text message from an unknown number pretending to be someone else. Petitioner feared
for her safety.

**C. On or about April 29, 2019 at or around 12:15 p.m.**
At Location: Georgetown University Campus near Reiss and Arrupe Halls
Petitioner had previously informed Respondent that she did not want to have any contact with him. Respondent
approached Petitioner in violation of a No Contact Order issued by Georgetown University. Respondent spoke
to Petitioner. Petitioner feared for her safety.

# EXHIBIT E

Madison Minelli
3620 Prospect St. NW Washington, D.C. 20007
Net ID: mam 749
GUID: 829162651
mam749@georgetown.edu
561-339-1040
May 9, 2019

Statement of Complaint to the Georgetown University Office of Student Code of Conduct
Regarding Mr. Jaron Pensinger

I am filing a formal complaint for sexual assault, as well as stalking and harassment against Mr. Jaron Pensinger on behalf of me and my family. On or around the early evening of April 5th, 2019, Jaron and I were in his dorm room, McCarthy Hall 718, when I was sexually assaulted by Mr. Pensinger. Originally, I consented to having sexual intercourse with Jaron, but as the acts escalated, I told him I was no longer comfortable continuing because it was bringing up memories I had from a previous sexual assault that he was, indeed, aware of. Jaron continued to pressure me by saying, "This is what couples do," and "If you loved me, you would just let me finish." I, soon, began to cry and scream, urging him to stop. Once again, he guilted me by saying what he said before. At one point, Jaron asked why I was crying and what was wrong. After I told him, he said "Can't we just finish? We're almost done." I repeatedly said no and tried to shove Jaron off of me in self-defense, but he still continued. Afterwards, I was in complete shock, feeling violated and traumatized all over again. I had substantial bleeding and bruising on my inner right thigh as a result. There were other occasions during the second-half of March when Jaron sexually assaulted me in which I had to defend myself, but this one was the most vivid and impactful to me.

After the incident, Jaron walked me to my house. I told him that I was going to go to the authorities about him raping me and he threatened me, saying that if I told anyone about it that he would say I physically abused him as retaliation. Up until this point, these words have kept me scared from telling the truth about this incident, but I truly believe that Jaron will do this to someone else unless he gets the help he needs. I was afraid to come forward, but Mr. Pensinger has left me no choice. His behavior has drastically escalated and I am not only scared for the safety of myself and my family, but also for the safety of others.

I then walked into my house at 3620 Prospect St., sobbing. My grandmother, who can serve as a potential witness to this, asked what was wrong and I revealed that Jaron had raped me. I also told my therapist about the incident and we agreed to have a conversation with Jaron about it. In that conversation, I asked that Jaron and I not be sexually active nor remain in either one of our bedrooms for one week to allow me to process what had happened. Jaron became very hostile and said that he would not talk to me for this week because of it.

On April 13th, 2019, while in Jaron's dorm room, he began to get verbally abusive, calling me names including a narcissist. I proceeded to tell Jaron that I needed to leave the situation because it was becoming too toxic. As a result, Jaron began to utter suicidal thoughts. I

quickly left his room and called GUPD. I told them about Jaron's suicidal comments and that I was scared for his safety, as well as my own. During my conversation with the dispatch, Jaron followed me down the hall, becoming increasingly hostile towards me. Thus, the dispatch urged GUPD to pick up the pace. There is a recording of this conversation as further evidence. When GUPD arrived, I spoke with Officer Floyd, while Jaron spoke to Officer Connor. While being questioned by Floyd, I soon revealed that I was a victim of verbal and sexual abuse by Mr. Pensinger. Immediately, I took the proper action and requested a No Contact Order through Georgetown University, which would go in effect the next morning.

Since the No Contact Order has been in place, Jaron has violated it at least four times to my knowledge. The first two times were when he tried to communicate with my mother over text messages, the third incident occurred on April 29th, 2019 when he approached me in person, and the last incident occurred yesterday when he indirectly reached out to me by way of his lawyer, a third party, which is strictly forbidden under the No Contact Order. The third time Jaron violated the No Contact Order was the most traumatizing event for me. I had just gotten out of my psychology exam earlier than expected at or around 12:15. I texted Floyd that I would not need a GUPD escort because my mom was already on her way to come get me, which she has often done if and when GUPD is not able to find an escort for me. I left the Academic Resource Center and went to wait on a bench outside between Reiss and Arrupe. It was not even two minutes later, when Jaron walked up to me, tulips in hand. Jaron repeatedly said he was sorry and "I don't care who you tell. You can tell whoever you want that I did this." I did not say a single word back to Jaron. Approximately thirty seconds later, my mom arrived and Jaron proceeded to give her the tulips, apologizing to her. She, also, did not say a single world to him. After he walked away, I called GUPD and reported the violation on my way to the Office of Student Conduct. A day or so later, a video tape, which can be obtained as evidence, was retrieved from the video cameras outside of Reiss and Arrupe, showing that Jaron had been pacing back and forth for a good twenty or so minutes across from the bench I would soon sit at. Jaron had been stalking me, looking for the perfect opportunity to ambush me when I was alone. He approached me immediately after my undercover escorts left.

I have also learned that Jaron has impersonated others in order to communicate with me through text messages and that he has even impersonated me through certain communications with the Office of Student Conduct.

Because of these events, I have had to seek protection by GUPD, MPD, and the courts. I have daily campus GUPD escorts to and from all of my commitments on campus. I also take steps to make sure that I am never alone and I am always in the company of another person. I also obtained a Temporary Protective Order against Jaron and I intended to seek a final protective order.

Jaron's behavior has significantly impacted me emotionally and physically. I had a class with Jaron this semester called Newman: The Catholic Way and because I felt so afraid of him, an undercover cop was instructed to sit near me in the class to ensure I got the protection that I needed.

Furthermore, these events have also impacted my health and academic performance. I have had panic attacks and lost a lot of weight as a result of not being able to eat due to the stress, and lost many hours of sleep due to night terrors about the incidents, specifically the sexual assaulted. I also began working closely with Carol Day on April 15th as an advocate from Georgetown Health Education Services for the aftermath of the sexual assault. As far as my academics, I have kept up with my work, but have not been able to concentrate as well and perform to my maximum potential, which is impacting my grades. I also received a postponement of my statistics final exam.

In addition, I plan to engage in intensive outpatient therapy during the summer to recover from this period. My therapists believe that this has dramatically increased my PTSD symptoms from my further sexual assault and that it has also triggered many new fears of mine.

The past few months, I have been subjected to Jaron's escalating verbal and sexual abuse towards me. In addition to putting my life in danger, he has been verbally abusive to my mother and grandmother on numerous occasions, including by making repeat phone calls and through unannounced visits to my house in the middle of the night. He has violated the No Contact Order several times. I am scared for what he could do to me and my family. If Jaron continues to remain nearby me and other students, I am very fearful of what he could do. His actions are quickly escalating, demonstrating a complete lack of self-control. I hope that the Pennsylvania police soon, or already have, seized his firearms. I do not trust Jaron and I am concerned about his capability of inflicting danger or harm upon others. I hope that Georgetown takes this matter very seriously in order to protect me, my family, and the Georgetown community as a whole.

Sincerely,

Madison Minelli